IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT ELKINS

**UNITED STATES OF AMERICA,**
    Plaintiff,

v.                                                    **CRIMINAL ACTION NO. 2:23CR08**
                                                           **(KLEEH)**

**ETHAN D. DELAUDER,**
    Defendant.

## MOTION TO DISMISS INDICTMENT

On May 2, 2023, a federal grand jury returned a two-count Indictment alleging that Mr. Delauder unlawfully possessed a firearm in violation of 18 U.S.C. § 922(g)(9) and 924(a)(2), and that Mr. Delauder possessed an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871. Defendant, Ethan Delauder, through counsel, Assistant Federal Public Defender Hilary Godwin, respectfully moves this Court to dismiss the two-count indictment against Mr. Delauder as both charges alleged violations of statutes that are unconstitutional on their face, and as applied to Mr. Delauder, pursuant to Federal Rule of Criminal Procedure 12(b)(2) and the Second Amendment to the United States Constitution as indicated by the Supreme Court decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022).

## STATEMENT OF FACTS

On the evening of September 24, 2020, West Virginia State Police Corporal J. Rich and Trooper B. Stout encountered Mr. Delauder near the intersection of Sugar Creek Road and Sand Run Road in Barbour County West Virginia. The officers were following up on a call for service in which a female reported being followed by another car in the area. Officers came

upon Mr. Delauder's vehicle while it was stopped. They approached the vehicle and reported to have immediately observed a shotgun near the passenger seat. Officers secured the firearm and, with consent, searched the vehicle. The officered located a "small amount" of suspected methamphetamine, which they seized along with the firearm, and ultimately released Mr. Delauder and his passenger. *See* Exhibit 1 West Virginia State Police Report of Incidence. In March 2018, Mr. Delauder pled guilty to a charge of Domestic Battery, in violation of W.Va. Code 61-2-28(a), and was sentenced to 30 days jail, which was suspended, and six (6) months unsupervised probation. *See* Exhibit 2 Barbour County West Virginia 17-M-264 plea agreement and judgement order.

## ARGUMENT

### A) The Legal Standard Under *Bruen*

The Second Amendment to the United States Constitution states that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 1996, Congress passed the Lautenberg Amendment to the Gun Control Act of 1968, codified at 18 U.S.C. § 922(g)(9). 1 P.L. 104-208, 110 Stat. 3009 (1996). Section 922(g)(9) provides that "[i]t shall be unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to . . . possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(9).
In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court interpreted the Second Amendment to protect an individual right to keep and bear arms. Following *Heller*, this Court developed a two-step inquiry for assessing Second Amendment challenges. If, at step one, the Court found that a "challenged law impose[d] a burden on conduct falling within the scope of

2

the Second Amendment's guarantee," then at step two it would subject the law to either strict or intermediate scrutiny. *United States v. Chester*, 628 F.3d 673, 680, 82-83 (4th Cir. 2010). This later step involved balancing the government's interest in firearm restrictions against the challenger's interest in keeping and bearing arms. *See, e.g., United States v. Carter*, 669 F.3d 411, 416-17 (4th Cir. 2012). The product of this balancing was a conclusion that a firearm restricting statute, almost always, posed no constitutional problem.

In June 2022, the United States Supreme Court issued *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). In *Bruen*, the Supreme Court rejected the approaches of every lower court that had previously upheld firearms regulations in the face of Second Amendment challenges. Instead, the Court held that firearms laws must be analyzed with respect to the plain constitutional text and the laws in place in 1791, when the Bill of Rights was ratified. *Id.* at 2126-30. Under *Bruen's* approach, regulations that prohibit conduct which falls within the "plain text" of the Second Amendment are presumptively unconstitutional, and the government must demonstrate the constitutionality of any statute by demonstrating that it is consistent with this Nation's historical tradition of firearms regulation. *Id.* at 2126.

*Bruen* held that when a statute addresses "a general societal problem that has persisted since the 18th century," the government may defend the statute's constitutionality only by demonstrating a robust tradition of "distinctly similar" historical regulations. *Id.* at 2131. It cannot carry its burden merely by showing that the statute is "relevantly similar" to historical analogues, as that less stringent standard is reserved for statutes aimed at "unprecedented" societal conditions that would have been "unimaginable at the founding." *Id.* at 2132.

As *Bruen* summarized, the "standard for applying the Second Amendment" now requires courts to do the following:

- If the Second Amendment's "plain text" covers an individual's conduct, courts must presume the Constitution "protects that conduct";
- To rebut this, the government must show that any restriction is "consistent with the Nation's historical tradition of firearm regulation";
- If the government cannot do so, the law is unconstitutional.

*Id.* at 2129–30 (quotations omitted). The Court held that it is the government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Because "constitutional rights are enshrined with the scope they were understood to have when the people adopted them," this analysis is tethered to the historical tradition in place when the "Second Amendment was adopted in 1791." *Id.* at 2136 (citation omitted).

**B) 18 U.S.C. § 922(g)(9) and 26 U.S.C. § 5861(d) Are Unconstitutional As Applied to Mr. Delauder**

**1) The Second Amendment's Plain Language Covers Mr. Delauder's Conduct**

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Mr. Delauder's conduct—possession of a short-barreled shotgun and ammunition proscribed by § 922(g)(1) and §§ 5861(d)—easily qualifies as "keep[ing]" and "bear[ing]" arms under the plain text of the Second Amendment. *See Heller*, 554 U.S. at 581 (defining "arms" to include "weapons of offence, or armour of defence," or "anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike

4

another"); *id.* at 584 (defining "bear arms "as to "wear, bear, or carry . . . for the purpose . . . of being armed and ready for offensive or defensive action in case of conflict with another person"); *see also* 18 U.S.C. § 921(a)(3) (defining "firearm" to include arms charged in Counts One and Two). Mr. Delauder's "course of conduct," *Bruen*, 142 S. Ct. at 2134, that is, "to possess . . . weapons in case of confrontation,'" is covered by the plain text of the Second Amendment. *Id.* at 2135 (quoting *Heller*, 554 U.S. at 592).

Likewise, Mr. Delauder is "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 580). "[T]he people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Because those convicted of misdemeanor crimes of domestic abuse are not "categorically excluded from our national community," they fall within the amendment's scope. *See Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting); accord *Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting).

Because Mr. Delauder's possession of the firearm and ammunition is covered within the plain text of the Second Amendment, his protection from prosecution is "presumptively guarantee[d]" unless the government meets its burden to prove that applying § 922(g)(9) and §§ 5861(d) to his conduct "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135.

### 2) The Government Cannot Show "an American tradition" Of Prohibiting Mr. Delauder's Conduct

The government cannot meet its burden to establish that the nation has a historical tradition of prohibiting the conduct Mr. Delauder is charged with in this case. *See id.* at 2126

5

("[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.").

*Bruen* offered analytical guidance for evaluating historical clues. In particular, *Bruen* drew a distinction between two types of regulations: those addressing persistent societal problems and those addressing novel, modern problems. On the one hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be relatively straightforward." *Id.* at 131. Courts should decide whether "a distinctly similar historical regulation address[ed] the problem." *Id.* If earlier generations did not prohibit the conduct, or if it was regulated "through materially different means," then the present prohibition may violate the Second Amendment. *Id.* On the other hand, if a prohibition implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," the "historical inquiry . . . will often involve reasoning by analogy." *Id.* at 2132. Courts may then ask whether historical prohibitions and the challenged prohibition are "relevantly similar," with special attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

    **a) There Is No Historical Precedent for Depriving Persons with A Single Domestic Violence Conviction from Possessing Firearms.**

Here, the problem at which 18 U.S.C.§ 922(g)(9) is aimed— domestic abusers' access to firearms—has persisted since before the founding, and so the "distinctly similar" test applies. Defendant is of the position that the government, will not be able to cite evidence that founding-era legislatures disarmed domestic abusers thus, § 922(g)(9) does not survive "distinctly similar" review. The statute violates the Second Amendment, and this Court should dismiss count one of the Indictment.

Importantly, the Supreme Court has made clear that the Second Amendment codified a preexisting right to keep and bear arms. *Bruen*, 142 S.Ct. at 2128 (noting that Second Amendment "'was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors'") (quoting *Heller*, 554 U.S. at 599). Because the Second Amendment codifies a pre-existing right, the Supreme Court has found it appropriate to "look[] to history." *Id.* The Court in *Heller* and *Bruen* identified several sources that may guide this Court's inquiry, including "English history dating from the late 1600s," "American colonial views leading up to the founding," pre- and post-ratification history, early English and American common law, the writings of William Hawkins and William Blackstone, both English jurists in the 1700s, and American caselaw in the 1800s. *Heller*, 554 U.S. at 582; *Bruen*, 142 S.Ct. at 2127-28, 2142. these historical sources and others demonstrate that at the time of the founding, the conduct now criminalized by § 922(g)(9) would not have resulted in firearm restrictions. In a recent post-*Bruen* decision, one district court in the Western District of Texas conducted a similar analysis of the history of firearms regulations in relation to domestic violence and concluded that 18 U.S.C. § 922(g)(8) was unconstitutional. *See Perez-Gallan*, 2022 WL1685816.

The defendant in *Perez-Gallan* was charged with violating § 922(g)(8), which prohibits firearm possession by one subject to a domestic violence restraining order. *Id.* at *2. Considering the historical record, the *Perez-Gallan* court concluded that the government failed to meet its burden to demonstrate that domestic violence would have resulted in the loss of firearms at the time of the founding. *Id.* at *15. Mr. Delauder submits that this Court will be required to draw the same conclusion with respect to § 922(g)(9).

7

Under *Bruen*, the government must identify a "distinctly similar" historical regulation at the time of the founding, because the "challenged regulation addresses a general societal problem that has persisted since the 18th century." *Bruen*, 142 S.Ct. at 2131. (Because the societal problem underlying § 922(g)(9) – offensive touching and violence between domestic partners – was not "unprecedented at the time of the founding," there is no basis to rely on *Bruen*'s alternative "nuanced" approach that allows consideration of "relevantly similar" regulations. *Id.* at 2132. In any event, as the *Perez-Gallan* court concluded, even under *Bruen*'s alternative approach the government would be unable to meet its burden because there were no "relevantly similar" regulations. *Perez-Gallan*, 2022 WL 16858516, at 15. The government will be particularly hard-pressed to find "distinctly similar" regulations in the context of common-law offensive touching and/or violence between spouses or domestic partners, because the historical record affirmatively demonstrates that "earlier generations addressed the societal problem . . . through materially different means," which is itself evidence that § 922(g)(9) is unconstitutional. *Id.*

### b) There Is No Historical Tradition of Requiring Gun Owners to Register Their Firearms

Similarly, the government cannot establish a broad historical tradition of requiring registration of firearms, let alone specifically firearm short-barreled rifles, § 5861(d) violates the Second Amendment as applied to Mr. Delauder. First enacted in 1934, the National Firearms Act (NFA) requires the government to "maintain a central registry of all firearms in the United States" known as the NFRTR. 26 U.S.C. § 5841(a); National Firearms Act of 1934, Pub. L. No. 730474, 48 Stat. 1236–1240. To register a firearm, a person must file a notice

"set[ting] forth the name and address of the manufacturer, . . . the date of manufacture, the type, model, length of barrel, overall length, caliber, gauge or size, serial numbers, and other marks of identification." 27 C.F.R. § 479.103; see also 26 U.S.C. § 5841(a). The NFA makes it "unlawful for any person . . . to receive or possess a firearm" that "is not registered to him in the [NFRTR]." 26 U.S.C. § 5861(d). Under the NFA, a firearm includes, inter alia, a "rifle having a barrel or barrels of less than 16 inches in length" and "any silencer." 26 U.S.C. §§ 5845(a)(3), (a)(7).

Like with § 922(g)(9) and the statute at issue in *Bruen*, the NFA is directed at a "general societal problem" that has existed since the founding: to discourage the proliferation of firearms used in crimes. *Bruen*, 142 S. Ct. at 2131. Therefore, the government must identify a "well-established and representative" tradition of "distinctly similar" historical regulations mirroring the provisions of the NFA charged here. *Id.* at 2131, 2133.

Until the early 1900s, there were no requirements to register firearms with the federal or state government. By the time of the enactment of the NFA in 1934, only 11 states had passed registration statutes, with the first taking effect in 1911.[1] These laws post-date the

---

[1] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2; 1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1; 1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person § 7; 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 5; 1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4; 1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers,

9

enactment of the Second Amendment by 120 years. According to *Bruen*, such recent evidence is irrelevant to the Second Amendment analysis unless it "confirm[s]" what earlier sources have already established, which is not the case here. 142 S. Ct. at 2137. The government will not be able to identify any earlier sources demonstrating a historical tradition of requiring registration of firearm. Indeed, the Court in *Bruen* declined even to "address any of the 20th-century historical evidence brought to bear. by respondents" because it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2153 n.28. The same is true of the registration statutes cited above; they provide no evidence § 5861(d)'s registration requirement is consistent with the nation's historical tradition of firearm regulation dating back to the enactment of the Second Amendment. *See id.* at 2137 (requiring evidence that a "governmental practice has been open, widespread, and unchallenged since the early days of the Republic").

Moreover, the registration statutes identified herein are at most "outliers." *Bruen*, 142 S. Ct. at 2153. Where only 11 of the then-48 states passed registration statutes by the mid-20th century, it is insufficient to show "a tradition" of such firearm regulation. *Id.* at 2142 ("doubting" that statutes from three of the original 13 colonies, equaling 23 percent, "could

---

Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4; 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8; 1931-1933 Wis. Sess. Laws 245-47, An Act . . . Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06; 1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3; 1934 Va. Acts 137- 39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

suffice to show a tradition" of firearm regulation). These isolated and post-dated registration statutes are therefore not "representative" in the way *Bruen* demands. *Id.* at 2133.

Finally, the early 1900s registration statutes were not directed to the type of firearms regulated here. Only one of the statutes—Michigan's 1913 regulation— required registration of silencers. *See* 1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1. Even though silencers were available and in common use as of at least 1913, only one state had chosen to require their registration, which does not evince the "open, widespread, and unchallenged" history of regulation that *Bruen* demands. *Bruen*, 142 S. Ct. at 2137. Moreover, although short-barreled firearms existed and were in widespread use at and shortly after the time of the Second Amendment's ratification,[2] it does not appear any locality required their registration. None of the regulations identified herein specifically required registration of short-barreled rifles. Although silencers and short-barreled rifles were available and in use in the early stages of our nation's history, there is no evidence of a historical tradition requiring their registrations. Therefore, the application of § 5861(d) by punishing Mr. Delauder for failing to register a short-barreled rifle is inconsistent with his protections under the Second Amendment.

---

[2] James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 HARV. J.L. & PUB. POL'Y 493, 508 (2017) ("Short-barrel firearms, unlike modern 'assault weapons,' did exist at the time of the Second Amendment's drafting and ratification."). Various versions of the blunderbuss, firearms "boasting very short barrels, were popular for self-defense and occasionally used by militaries." *Id.* at 503.

11

## CONCLUSION

Because the government is unable to establish that applying §§ 922(g)(1) and 5861(d) to the conduct charged against Mr. Delauder "is consistent with this Nation's historical tradition of firearm regulation," all counts of the Indictment must be dismissed. *Bruen*, 142 S. Ct. at 2135. Application of §§ 922(g)(1) and 5861(d), to Mr. Delauder violates his Second Amendment rights to possess firearms. For the foregoing reasons, Mr. Delauder respectfully requests that the Court grant this motion and dismiss the Indictment.

Respectfully submitted

**Ethan D. Delauder**
By Counsel

*s/ Hilary L. Godwin*
Hilary L. Godwin (WV Bar # 12280)
Federal Public Defender's Office
230 West Pike Street; Suite 360
Clarksburg, West Virginia 26301
Tel. (304) 622-3823
E-Mail. Hilary_Godwin@fd.org

**CERTIFICATION OF SERVICE**

I hereby certify that on July 7, 2023, I electronically filed the foregoing *Motion to Dismiss Indictment* with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**U.S. Attorney's Office - Elkins**
**PO Box 190**
**Elkins, WV 26241**

*s/ Hilary L. Godwin*
Hilary L. Godwin (WV Bar # 12280)
Federal Public Defender's Office
230 West Pike Street; Suite 360
Clarksburg, West Virginia 26301
Tel. (304) 622-3823
E-Mail. Hilary_Godwin@fd.org

13